IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DARIN RUARK,

    *Plaintiff*,

    v.

BMW OF NORTH AMERICA, LLC,
*et al.*,

    *Defendant*.

Civil Action No. ELH-09-2738

**MEMORANDUM OPINION**

This suit arises from a single-vehicle accident that occurred on July 30, 2006. Plaintiff Darin Ruark, then a 17-year-old rising high school senior, suffered a catastrophic neck injury on that date, when the 1995 BMW 325is coupe (the "subject vehicle") in which he was riding as a front-seat passenger experienced a rollover, either two or three times. As a result of the accident, plaintiff suffered catastrophic injuries.[1]

Following the accident, plaintiff filed suit against BMW of North America, LLC, the distributor of the subject vehicle, and BMW AG, the manufacturer of the subject vehicle (collectively, "BMW"), alleging, *inter alia*, that BMW was negligent in designing the roof of the vehicle and that BMW is strictly liable for plaintiff's damages because the roof of the subject vehicle was defective and unreasonably dangerous.[2]

---

[1] In the proposed Pretrial Order (ECF 165), plaintiff states that Mr. Ruark is a paraplegic, but defendant states that Mr. Ruark is a tetraplegic. *See* ECF 165 at 2, 5. And, in previous filings, plaintiff stated that Mr. Ruark is a quadriplegic. *See, e.g.*, ECF 114 at 4. The discrepancy is not material here.

[2] In a separate suit filed in the Circuit Court for Baltimore City, plaintiff and his father, Bruce Ruark, sued James Bradford, the driver of the subject vehicle, and the Salvation Army and Clifford Griffith, the driver of a Salvation Army vehicle whose driving may have precipitated the

The Court has subject matter jurisdiction based on diversity of citizenship. *See* 28 U.S.C. § 1332. In exercising diversity jurisdiction, a federal court "must apply the substantive law of the forum state including its choice of law rules." *Colgan Air, Inc. v. Raytheon Aircraft Co.,* 507 F.3d 270, 275 (4th Cir. 2007). Maryland is, of course, the forum state. Under Maryland's choice-of-law principles, tort claims are governed by the law of the state where the alleged harm occurred ("*lex loci delicto*"). The accident which forms the basis of this lawsuit occurred in Maryland. Therefore, Maryland's substantive law governs this case. I must apply the law of Maryland as it has been interpreted by the Maryland Court of Appeals, without regard to my own views about the wisdom or accuracy of that court's interpretations.

In the context of plaintiff's strict liability claim (Count One), the parties disagree as to which of two tests is appropriate, under Maryland law, to determine whether BMW is strictly liable for a design defect in regard to the roof structure of the subject vehicle. One test is known as the "consumer expectation test" and the other is called the "risk-utility test."

BMW filed a motion in limine in which it requested "an order prohibiting plaintiff . . . from offering testimony concerning and alluding to the consumer expectation theory of products liability . . . to the exclusion of the risk-utility test for a design defect. . . ." ECF 135. The motion in limine noted that BMW would provide further argument in its "pre-trial order submission." ECF 135-1. Plaintiff filed an opposition to the motion in limine, in which he urged the application of the consumer expectation test. ECF 153. BMW then filed a "Pre-Trial Memorandum of Law Regarding Applicability of Risk-Utility Test Rather Than Consumer Expectation Test." ECF 166. Thereafter, plaintiff filed "Plaintiff's Pretrial Memorandum of

---

accident. That case has been settled. However, because Mr. Bradford executed a *Swigert* release, BMW filed a third party claim against Mr. Bradford in this action.

Law Regarding the Applicability of The Consumer Expectations Test Alone or in Conjunction with The Risk-Utility Test." ECF 169. Finally, BMW filed a Reply in support of its motion in limine. ECF 176. Argument was heard at a motions hearing held on April 22, 2014.

The consumer expectation test, which is preferred by plaintiff, derives from Restatement (Second) of Torts § 402A (1965). *See Halliday v. Sturm, Ruger & Co.*, 368 Md. 186, 193, 792 A.2d 1145, 1150 (2002). Restatement (Second) of Torts § 402A provides, in relevant part:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
> > (a) the seller is engaged in the business of selling such a product, and
> > (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"Defective condition" is defined as a "condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." Restatement (Second) of Torts § 402A at cmt. g; *see Halliday*, 368 Md. at 193, 792 A.2d at 1150. Under this test, a product is "unreasonably dangerous" if it is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it with the ordinary knowledge common to the community as to its characteristics." Restatement (Second) of Torts § 402A at cmt. i; *see Halliday*, 368 Md. at 193, 792 A.2d at 1150; *see also* W. Page Keeton *et al.*, *Prosser and Keeton on the Law of Torts*, § 99, at 698 (5th ed. 1984). Arguing in favor of the consumer expectation test, plaintiff contends that "the Maryland Court of Appeals has repeatedly held that the consumer expectation test should be applied to determine whether a product is defective and unreasonably dangerous." ECF 153 at 2.

The risk-utility test, which is preferred by BMW, "regards a product as defective and unreasonably dangerous, for strict liability purposes, if the danger presented by the product

outweighs its utility." *Halliday,* 368 Md. at 194, 792 A.2d at 1150. In *Lloyd v. General Motors Corp.*, 275 F.R.D. 224 (D. Md. 2011) ("*Lloyd II*"),[3] on which BMW relies, Judge Legg explained, *id.* at 226:

> Maryland's risk-utility test calls on the jury to make two determinations. The jury must initially assess the safety performance of the product. Then, the jury must decide whether a feasible, safer alternative design existed. The two steps are required because a product is not defective simply because it poses a risk of injury. Many useful and necessary products pose risks. A product is defective only if the danger presented by the product outweighs its utility. Investigating this balance inevitably leads the jury to focus on whether foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller.

Application of the risk-utility test generally requires the consideration of several factors, including the feasibility and cost of alternative product designs. *See, e.g.*, *Lloyd I*, 266 F.R.D at 108 (articulating seven-factor test).[4] As the Maryland Court of Appeals observed in *Halliday*,

---

[3] There are two opinions in *Lloyd v. General Motors*. The first opinion, which I will refer to as *Lloyd I*, denied plaintiffs' motion for class certification. *See Lloyd v. Gen. Motors Corp.*, 266 F.R.D. 98 (D. Md. 2010). The second opinion, which I will refer to as *Lloyd II*, denied plaintiffs' second motion to certify a more narrow class. *See Lloyd v. General Motors Corp.*, 275 F.R.D. 224 (D. Md. 2011). Both opinions adopt the risk-utility test for strict liability.

Coincidentally, the present case was originally assigned to Judge Legg. But, it was reassigned to me in January 2011.

[4] The *Lloyd I* Court applied a seven-factor test, which it drew from *Ziegler v. Kawasaki Heary Industries, Ltd.,* 74 Md. App. 613, 624–25, 539 A.2d 701, 706–07, *abrogated on other grounds by Halliday*, 368 Md. at 199–200, 792 A.2d at 1153; *see also Higginbotham v. KCS International, Inc.,* 85 Fed. App'x 911, 916 (4th Cir. 2004). The seven factors identified in *Lloyd I*, 266 F.R.D. at 108, and by other courts, are:

> (1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.
> (2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.
> (3) The availability of a substitute product which would meet the same need and not be as unsafe.

368 Md. at 194, 792 A.2d at 1150, the "'risk-utility' test" is "applied principally to alleged defects in the *design* of a product. . . ." Urging application of the risk-utility test, BMW claims that "it would be pointless to ask whether a reasonable consumer would or would not expect an A-pillar to deform in a rollover accident. Any reasonable consumer would want to know the safety tradeoffs involved in making the A-pillar more rigid." ECF 166 at 7.

As noted, the matter of the consumer expectation test and the risk-utility test pertain to a claim for strict liability. Maryland law as to strict liability can be traced primarily to three cases decided by the Maryland Court of Appeals. In 1976, in answer to questions certified by this Court, the Maryland Court of Appeals first adopted the doctrine of strict liability in tort. *See Phipps v. Gen. Motors Corp.*, 278 Md. 337, 363 A.2d 955 (1976). The plaintiff in *Phipps* alleged a latent design defect in an automobile's accelerator mechanism, which became struck while the vehicle was being driven.

The court explained the various rationales behind the concept of strict liability, *id.* at 343, 363 A.2d at 958 (quotation marks and citations omitted):

> It has been said that the cost of injuries caused by defective products should in equity be borne by the manufacturers that put such products on the market rather

---

> (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.
> (5) The user's ability to avoid danger by the exercise of care in the use of the product.
> (6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.
> (7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

than by the injured persons who are powerless to protect themselves and that warranties serve this purpose fitfully at best. It has also been suggested that imposing strict liability on manufacturers for defective products is equitable because it shifts the risk of loss to those better able financially to bear the loss. Another reason advanced is that a consumer relies upon the seller in expecting that a product is safe for the uses for which it has been marketed, and that this expectation is better fulfilled by the theory of strict liability than traditional negligence or warranty theories. And still another reason advanced is that the requirement of proof of a defect rendering a product unreasonably dangerous is a sufficient showing of fault on the part of the seller to impose liability without placing an often impossible burden on the plaintiff of proving specific acts of negligence.

The Maryland Court of Appeals then set forth the elements of an action in strict liability, as provided in Restatement (Second) of Torts § 402A. Although the *Phipps* Court did not refer to the test as the "consumer expectation" test, the test it described is the test urged by plaintiff here. *See id.* at 344, 363 A. 2d at 958. The court added that, unlike in a traditional negligence action, "the plaintiff need not prove any specific act of negligence on the part of the seller. The relevant inquiry in a strict liability action focuses not on the conduct of the manufacturer but rather on the product itself." *Id.*

Notably, the court acknowledged that, when "the alleged defect is the result of the design process so that the product causing injury was in a condition intended by the manufacturer, the [§ 402A] test has proved more difficult to apply." *Id.* at 344–45, 363 A.2d at 959. The court explained that some commentators suggested that, "in a design defect case the standard of defectiveness under Section 402A . . . still requires a weighing of the utility of risk inherent in the design against the magnitude of the risk.[]" *Id.* at 345, 363 A.2d at 959.

Of import here, the court explained that "the theory of strict liability is not a radical departure from traditional tort concepts." *Id.* at 351, 363 A.2d at 963. Notwithstanding the terminology of the doctrine, "the seller is not an insurer, as absolute liability is not imposed on

the seller for any injury resulting from the use of his product." *Id.*  Rather, "[p]roof of a defect in the product at the time it leaves the control of the seller implies fault on the part of the seller . . . for injuries caused by the product." *Id.*  Moreover, it noted that, under § 402A, defenses are still available to the seller, such as "where injury results from abnormal handling or use of the product. . . ." *Id.* at 346, 363 A.2d at 960.

Nevertheless, the court observed that "there are those kinds of conditions which, whether caused by design or manufacture, can never be said to involve a reasonable risk." *Id.* at 345, 363 A.2d at 959.  Therefore, the court expressly "adopt[ed] 'the theory of strict liability as expressed in Section 402A of the Restatement (Second) of Torts," and as referred to today as the "consumer expectation" test. *Id.* at 353, 363 A.2d at 963.  It reasoned:  "In our view, there is no reason why a party injured by a defective and unreasonably dangerous product, which when placed on the market is impliedly represented as safe, should bear the loss of that injury when the seller of the product is in a better position to take precautions and protect against the defect." *Id.* at 352–53, 363 A.2d at 963.

The Maryland Court of Appeals revisited the issue in *Kelley v. R.G. Indus., Inc.*, 304 Md. 124, 497 A.2d 1143 (1985).  In *Kelley*, the plaintiff was shot during a robbery attempt, and he then sued the manufacturer of the gun with which he was shot.  The *Kelley* Court began by noting, *id.* at 135, 497 A.2d at 1148: "In determining whether a product is defective, in its design or its manufacture, Maryland cases have generally applied the 'consumer expectation' test" that was applied in *Phipps*.  Applying that test, the *Kelley* Court concluded: "A handgun manufacturer or marketer could not be held liable under this theory. . . .  A consumer would

expect a handgun to be dangerous, by its very nature, and to have the capacity to fire a bullet with deadly force." *Id.* at 136, 497 A.2d at 1148.

The court then turned to the risk-utility test, which it described as "[a]nother test used to determine whether a design defect exists under § 402A . . . ." *Id.* at 136, 497 A.2d at 1148. The court observed that the Supreme Court of California had "articulated a dual definition for a design defect, the second part of which rests on a balancing of the product's risks and utilities," and that numerous jurisdictions had followed suit and "adopted a risk/utility test as an alternate standard for the determination of design defects." *Id.* at 137, 497 A.2d at 1149 (citing *Barker v. Lull Engineering Co., Inc.*, 20 Cal. 3d 413, 143 Cal. Rptr. 225 (1978)). And, the court acknowledged that in *Phipps* it had recognized that "'in some circumstances'" the risk-utility test might apply. *Id.* at 137, 497 A.2d at 1149.

Ultimately, however, the *Kelley* Court reasoned that "no decision of this Court in a product liability case has expressly rested upon an application of the risk/utility test," and it concluded that the risk-utility test was inapplicable to the facts before it. *Id.* at 138, 497 A.2d at 1149. The court said, *id.* (emphasis added):

> We believe, however, that the risk/utility test is inapplicable to the present situation. **This standard is only applied when something goes wrong with a product.** In *Barker* [*v. Lull Engineering Co., Inc.*, 20 Cal. 3d 413 (1978)], an unbalanced machine tipped over. In *Back v. Wickes Corp.*, [375 Mass. 633, 378 N.E.2d 964 (1978)], a motor home exploded, and in *Duke v. Gulf & Western Mfg. Co.*, [660 S.W.2d 404 (Mo. App. 1983)], a power press caught the plaintiff's hands. These products malfunctioned. On the other hand, in the case of a handgun which injured a person in whose direction it was fired, the product worked precisely as intended. **Therefore, the risk/utility test cannot be extended to impose liability on the maker or marketer of a handgun which has not malfunctioned.**

The Maryland Court of Appeals returned to the question of the proper test to apply to a strict liability claim yet again in *Halliday v. Sturm, Ruger & Co.*, *supra*, 368 Md. 186, 792 A.2d 1145. *Halliday* arose "from the tragic death of Jordan Garris, [who] shot himself while playing with his father's handgun." 368 Md. at 188, 792 A.2d at 1146. The child was just three years of age. *Id.* Garris's mother, who was the petitioner in the Maryland Court of Appeals, sought to hold the manufacturer of the gun liable, alleging "that the gun was defective and unreasonably dangerous because its design failed to incorporate reasonable devices to prevent its use by young children." *Id.* at 190, 792 A.2d at 1148 (internal quotation marks omitted). The petitioner urged the court to apply "'risk-utility' analysis in lieu of a 'consumer expectation' test and hold that the gun in question failed that preferred test because (1) the risk of excluding child safety features outweighs the utility of that exclusion, and (2) alternative safer designs could have been adopted economically." *Id.* at 192, 792 A.2d at 1149. The *Halliday* Court (Wilner, J.) described the issue presented by the case as "whether, in examining whether a product in general, or a handgun in particular, is defective for purposes of a strict liability action, this Court should continue to apply the 'consumer expectation' test . . . or should adopt instead a version of the 'risk-utility analysis.'" *Id.* at 193, 792 A.2d at 1149–50.

The *Halliday* Court reviewed the competing tests applicable to strict liability as well as its prior opinions in *Phipps* and *Kelley*. The court noted, *id.* at 200–01, 792 A.2d at 1154:

> There has been a great deal of ferment regarding these issues, both in Maryland and elsewhere. Some of the debate is grounded in theory—whether, on the one hand, a consumer expectation test is either relevant or workable in a design defect situation, especially when the product is inherently dangerous, or, on the other, whether a departure from the consumer expectation test necessarily reintroduces negligence concepts, by focusing on the manufacturer's conduct rather than the product itself, and thus becomes inconsistent with the notion and function of strict liability. That debate has a practical significance. The concept

of strict liability, especially as formulated in § 402A of Restatement (Second), was regarded as an important pro-consumer advance; relieving persons injured by products from the requirement of proving negligence on the part of manufacturers or others in the distribution chain and focusing, instead, on the product itself, made it easier to obtain a recovery for a defectively designed or manufactured product. Substitution of a risk-utility analysis, however, especially as formulated in the Restatement (Third), has attracted considerable criticism and has been viewed by many as a retrogression, as returning to negligence concepts and placing a very difficult burden on plaintiffs.

After describing the state of the law in other jurisdictions and summarizing the Maryland legislature's response to *Kelley*, the *Halliday* Court ultimately concluded: "Given the controversy that continues to surround the risk-utility standard articulated for design defect cases in § 2 of the Restatement (Third), we are reluctant at this point to cast aside our existing jurisprudence in favor of such an approach on any broad, general basis." *Id.* at 209, 792 A.2d at 1159. According to the Maryland Court of Appeals, the holding "in *Kelley*, that the risk-utility test does not apply to a design defect unless the product malfunctions in some way . . . remain[s] the law of Maryland." *Id.* at 200, 792 A.2d at 1153.[5]

Notably, the *Halliday* Court expressly rejected a series of cases in which the State's intermediate appellate court, the Maryland Court of Special Appeals, had "appl[ied] the risk-utility test in design defect cases involving the lack of a safety device, sometimes, unfortunately, by misconstruing, side-stepping, or ignoring what we said in *Kelley*." *Id.* at 199, 792 A.2d at 1153. Conversely, the Maryland Court of Appeals approved the Court of Special Appeals's application of the consumer expectation test in *Simpson v. Standard Container Co.*, 72 Md. App.

---

[5] *Halliday* was previously heard *en banc* by the State's intermediate appellate court, the Maryland Court of Special Appeals, 138 Md. App. 136, 770 A.2d 1072 (2001). The dissenting opinion in that court urged application of the risk-utility test. As a member of that court, I had joined the dissent. In a 6 to 1 decision in *Halliday*, the Maryland Court of Appeals upheld the majority opinion.

199, 527 A.2d 1337 (1987).  As the *Halliday* Court described it, *Simpson* "involved a gasoline can that, despite clear warnings to the contrary, the buyer stored, full of gasoline, in his basement, where a four-year-old child found and opened it, causing the gasoline to spill, ignite, and severely burn the child."  *Halliday*, 368 Md. at 199, 792 A.2d at 1153.  The plaintiff in *Simpson* urged application of the risk-utility test but, according to the *Halliday* Court, the Court of Special Appeals "correctly noted that '[t]o determine whether a product is defective in its design, Maryland cases have generally used the "consumer expectation" test.'"  *Id.* (*quoting Simpson*, 72 Md. App. at 203, 527 A.2d at 1340).

From these three cases, guiding principles emerge.  First, the Maryland Court of Appeals has addressed the proper standard in a strict liability design defect case on three occasions; all three times, it adopted the consumer expectation test.  Second, a manufacturer's failure to include a safety device on a product is properly analyzed under the consumer expectation test.  *See id.* at 199, 792 A.2d at 1153.  Third, and most critically here, "the risk-utility test does not apply to a design defect *unless the product malfunctions in some way*."  *Id.* at 200, 792 A.2d at 1153 (emphasis added); *see also Parker v. Allentown, Inc.*, 891 F. Supp. 2d 773, 791 (D. Md. 2012) ("The risk/utility test applies when something goes wrong with the product." (internal quotation marks omitted)); *Cantrell v. Wirtgen Am., Inc.*, Civ. No. CCB-07-2778, 2011 WL 915324, at *7 (D. Md. Mar. 15, 2011) ("[T]he risk-utility test applies in design defect cases only when the product malfunctions in some way.").

Application of these principles to the present case depends on what constitutes a "malfunction" and how plaintiff's claim is characterized.  At the motions hearing, counsel for BMW contended that plaintiff was alleging that the roof of the subject vehicle malfunctioned, in

that the roof of vehicle crushed inward and caused harm to a passenger.[6]  According to defense

counsel, plaintiff's view is that something went wrong with the product so as to require

application of the risk-utility test.  *See Parker*, 891 F. Supp. 2d at 791.  Counsel for plaintiff

disagreed.  In his view, plaintiff's allegation is not that the subject vehicle malfunctioned.

Instead, plaintiff's claim is that the roof of the vehicle performed precisely as BMW designed it

to perform.  The problem, according to plaintiff, is that the design was flawed.  Put another way,

he maintains that what occurred was consistent with the design; the question is whether the

design should have called for a stronger roof.[7]

Defendants' argument in favor of application of the risk-utility test relies primarily on the

decisions of Judge Benson Legg in *Lloyd I* and *Lloyd II*.  The dispute in *Lloyd* concerned

allegations that the seats in certain vehicles were "defective because they are prone to collapse

rearward in moderate speed rear-impact collisions."  *Lloyd II*, 275 F.R.D. at 226.  The allegations

were not that the seats had somehow malfunctioned; rather the claim was that the seatbacks

should have been designed to be more rigid.  Despite the above-described pronouncements by

the Maryland Court of Appeals, Judge Legg ruled that the risk-utility test would apply.

In reaching that conclusion, Judge Legg distinguished the circumstances before him from

those in *Halliday* in two ways.  First, he noted that "both *Kelley* and *Halliday* were handgun

cases and involved a product designed to inflict harm on humans and, therefore, cause harm

---

[6] BMW does not admit that the inward crush of the roof caused plaintiff's injuries. Defense counsel's statements on this issue were simply about his interpretation of plaintiff's allegations; they were not concessions or representations regarding causation or liability.

[7] In mathematical terms, plaintiff's claim is not that the roof was built to sustain $x$ amount of force but, because of a malfunction, crushed when $(x - 1)$ force was applied. Rather, his claim is that the roof was built to sustain $x$ amount of force and, as expected, crushed when $(x + 1)$ force was applied. The question is not one of malfunction, but of whether the roof should have been designed to withstand $(x + 1)$ force.

without malfunctioning. Handguns have no applicability to motor vehicles." *Id.* at 230. Second, he noted, *id.*:

> [T]he Court of Appeals characterized both *Halliday* and [*Ziegler v. Kawasaki Heavy Indus., Ltd.*, 74 Md. App. 613, 615, 539 A.2d 701, 702 (1988)] as safety device cases. The issue in *Halliday* was whether handguns should have child safety devices to prevent them from being used by children. The issue in *Kawasaki* was whether a motorcycle should have a protective cage to guard a rider's legs. . . . This is not a safety device case.

In my view, neither of the distinctions drawn by Judge Legg warrants a departure from the principles articulated by the court in *Halliday*. First, the *Halliday* Court did not give any indication that its holding was limited to cases involving handguns or other products intended to inflict harm; rather, it explicitly approved use of the consumer expectation test in a case involving an allegedly defective gasoline can. *Halliday*, 368 Md. at 199, 792 A.2d at 1153 (discussing *Simpson*, *supra*, 72 Md. App. 199, 527 A.2d 1337).

The *Lloyd* Court's second distinction is no more convincing. Although it is true that both *Halliday* and *Ziegler* were safety device cases, *Phipps*, the first of the three cases in which the Court of Appeals applied Restatement (Second) of Torts § 402A, did not involve any allegedly missing safety device. Rather, it concerned an allegedly defective accelerator. Moreover, limiting the consumer expectation test to cases involving safety devices would allow the exception (*i.e.* the risk-utility test) to swallow the rule (*i.e.* the consumer expectation test). Instead, it is the risk-utility test that only applies in certain, limited circumstances—those in which a product malfunctions (*i.e.* performs in a manner other than how it was designed to perform). *See Halliday*, 368 Md. at 209, 792 A.2d at 1159 ("[W]e are reluctant at this point to cast aside our existing jurisprudence [which applies the consumer expectation test] in favor of [the risk-utility] approach on any broad, general basis.").

Of import here, the *Halliday* Court expressly indicated that, in several earlier decisions, the State's intermediate appellate court should have applied the consumer expectation test, rather than the risk-utility test. These cases concerned claims of injury from a conveyor belt, *C & K Lord v. Carter*, 74 Md. App. 68, 536 A.2d 699 (1988); a motorcycle, *Ziegler*, 74 Md. App. 613, 539 A.2d 701; a radial saw, *Klein v. Sears Roebuck*, 92 Md. App. 477, 608 A.2d 1276 (1992); and a pickup truck, *Nissan Motor Co., Ltd. v. Nave*, 129 Md. App. 90, 740 A.2d 102 (1999). *See Halliday*, 368 Md. at 199–200, 792 A.2d at 1153. *Nave* provides an apt comparison.

Donald Nave "was driving a 1989 Nissan pickup truck when he crashed head-on into a jack-knifing tractor-trailer." 129 Md. App. at 94, 740 A.2d at 104. "As a result of the collision, Nave struck the pickup's steering assembly and sustained fatal chest injuries." *Id.* Nave's estate and surviving family members brought suit against Nissan, alleging that the vehicle's steering column was designed defectively. Plaintiffs claimed that, when Nave's chest contacted the steering wheel, the steering column should have absorbed the force and compressed downward. But, because of the angle at which Nave's chest hit the steering wheel, the compression mechanism was ineffective and failed to absorb the force, causing Nave's fatal injuries. According to the plaintiffs, alternative design of the steering column would have allowed the compression mechanism to function properly without regard to the angle at which Nave's chest contacted the steering wheel. Nissan defended its design, contending that the "column [functioned] like it's supposed to," but that "the accident was 'non-survivable'" because of the severity of the impact. *Id.* at 107, 740 A.2d at 111. In Nissan's view, "no steering column in existence . . . would have been able to dissipate the large amount of kinetic energy that Nave exerted just prior to striking the steering wheel." *Id.*

In *Nave,* the Maryland Court of Special Appeals applied the risk-utility test in its analysis and ruled that plaintiffs "failed to produce sufficient evidence to support their design defect cause of action with respect to each of the five alternative designs that were mentioned at trial." 129 Md. App. at 131, 740 A.2d at 124. However, as indicated, the *Halliday* Court explicitly disapproved of the result reached by the intermediate appellate court, stating that the court should have applied the consumer expectation test. *See Halliday*, 368 Md. 186, 199–200, 792 A.2d 1145, 1153 (2002).

The circumstances here are analogous to those in *Nave*. In both *Nave* and in the instant case, the products were not intended to cause harm. In fact, both the roof here and the steering column in *Nave* were designed, in part, to *prevent* harm to vehicle occupants. And, in both cases, the products allegedly functioned as designed to function. But, the plaintiffs in each case maintained that the design was insufficiently protective of the vehicle occupant in the particular circumstance of each accident. Even though the products performed as designed, the plaintiffs claimed that they should have been designed to do more and to protect in a wider range of circumstances.

Upon review of *Phipps*, *Kelley*, and *Halliday*, I cannot subscribe to BMW's position, as it would turn the Maryland Court of Appeals's jurisprudence on its head. That court has repeatedly made clear that the consumer expectation test is the rule in Maryland, not the exception. BMW's position is essentially that a malfunction occurs whenever a product that is not intended to cause harm to a consumer does, in fact, cause harm. However, the vast majority of products are not intended to cause harm to consumers.[8] If the mere fact that a product caused harm to a consumer

---

[8] The exceptions, of course, are guns or other weapons.

means that the product "malfunctioned," then nearly all product liability cases would involve a malfunction and require application of the risk-utility test. But, that result would be contrary to the Maryland Court of Appeals's clear adoption of the consumer expectation test as the default rule in Maryland.

The better view is that espoused by plaintiff: A product does not malfunction when it performs as it was designed to perform, even if unintended harm results. Here, if the roof crushed inward because the accident imposed a greater amount of force than the roof was designed to absorb, that is not a malfunction within the meaning of the Maryland cases discussed above. Thus, the inquiry for the jury as to Count One of the Complaint will be whether the design of the vehicle's roof was "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchased it with the ordinary knowledge common to the community as to the product's characteristics." *Halliday*, 368 Md. at 194, 792 A.2d at 1150.

As to BMW's assertion that "it would be pointless to ask whether a reasonable consumer would or would not expect an A-pillar to deform in a rollover accident," ECF 166 at 7, I do not agree that such a question would be "pointless." In my view, it is well within the ken of a jury to determine whether a reasonable consumer would have expected the roof of the subject vehicle to withstand the impact of a rollover crash under the circumstances attendant here.[9]

---

[9] I note that plaintiff is also pursuing a negligence claim against BMW. Several of the factors involved in the risk-utility test are germane to the question of whether BMW was negligent in designing the subject vehicle, including "whether potentially safer alternative designs were technologically feasible, cost-effective, and available when the vehicles were manufactured.'" Reply at 8–9 (quoting *Lloyd II*, 275 F.R.D. at 230). And, plaintiff did not seek to exclude such evidence in the context of the negligence claim.

For all of these reasons, I believe that Maryland law requires application of the consumer expectation test. Accordingly, I decline to follow *Lloyd*, and I will instead apply the consumer expectation test.

Plaintiff has also requested: "If the Court decides that the consumer expectation test should not be applied alone, then it should follow the Court of Appeals' lead in *Kelley* and apply the [dual] definition test articulated by the California Supreme Court in *Barker v. Lull*." ECF 153 at 12. Under the dual definition test urged by plaintiff, the Court would instruct the jury that it could hold BMW strictly liable under *either* the consumer expectation test *or* the risk-utility test. Further, plaintiff argues that the dual definition "appears to be the approach adopted in the Maryland Pattern Jury Instructions." *Id.* Because I will apply the consumer expectation test, I need not rule on plaintiff's alternative argument in favor of adopting a dual definition. However, I will note a few concerns with regard to it.

First, although plaintiff couches the argument as if it were a compromise between his position and that of BMW, it is undeniably the most plaintiff-friendly of the options presented to the Court. Not only would plaintiff be able to argue to the jury under his preferred test, he would also have a second theory under which he could argue. Second, and more important, application of the dual test would not be "following the lead" of the *Kelley* Court. The *Kelley* Court simply noted the *Barker* Court's use of the dual test; the *Kelley* Court did not endorse it, adopt it, or apply it. Third, contrary to plaintiff's suggestion, the Maryland Pattern Jury Instructions ("MPJI") have not adopted the dual approach. Rather, the MPJI sets forth each of the two tests while explicitly noting that the risk-utility test is an "alternative" (as opposed to "additional") instruction to be given "if [the] product malfunctioned." *See* MPJI 26:14–15.

## CONCLUSION

In sum, the Maryland Court of Appeals has made clear that, unless a product malfunctions, the consumer expectation test applies in a strict products liability case. And, plaintiff does not claim that the roof of the vehicle malfunctioned. Accordingly, I will instruct the jury in accordance with the consumer expectation test.


Date: April 24, 2014

                                      _____/s/_____
                                      Ellen L. Hollander
                                      United States District Judge